IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

UNITED STATES OF AMERICA

v.                                           CRIMINAL ACTION NO.   3:22-00070

GEORGE MICHAEL THAYER

**MEMORANUDM OPINION AND ORDER**

Pending before the Court is Defendant George Michael Thayer's Motion to Suppress Evidence. ECF No. 67. On November 30, 2022, the Court held a Pretrial Motions Hearing and heard testimony and arguments presented by the parties.[1] At the conclusion of the hearing, the Court directed the Government to produce additional recordings and documents, if available, and for the parties to submit closing briefs. Following several extensions of time granted on behalf of Defendant, briefing is now complete, and the motion is ripe for determination. Upon consideration of the evidence and arguments of the parties, the Court **DENIES** the motion with respect to the constitutionality of the traffic stop and **HOLDS IN ABEYANCE** Defendant's request to suppress the contents of his cellphone.

**I.
FACTUAL BACKGROUND**

On January 24, 2022, Defendant was driving eastbound on I-64 in a red Oldsmobile Bravado SUV that had a spare tire attached to the roof of the vehicle. As Defendant neared the St. Albans entrance ramp, he slowed to permit West Virginia State Police Corporal Justin Garren merge onto the interstate in his marked police cruiser. Corporal Garren testified that, after he

---

[1] The Court also entertained arguments and made rulings on other motions that were pending at the time.

merged in front of Defendant, he noticed that Defendant created a significant distance between his vehicle and the cruiser.

Less than a mile after getting on the interstate, Corporal Garren turned off at the Nitro exit. As he was traveling down the exit ramp, he observed Defendant's vehicle also exit. Corporal Garren testified that he waited at the bottom of the ramp and allowed Defendant to pass him. As he passed, Corporal Garren stated that he noticed the driver was a white male in his 50s. Corporal Garren said he then ran the license plate through the computer in his cruiser, which showed the vehicle was registered to George Thayer. When he clicked on the name, the computer indicated there were four drivers with the name George Thayer in West Virginia. Corporal Garren noticed that two lived in the area, but only one of those two, Defendant, had a birthdate that seemed to coincide with the age of the driver he saw in the vehicle. Corporal Garren's search also alerted him that the George Thayer he believed was driving the vehicle had a revoked license. Therefore, Corporal Garren stated that he decided he would initiate a traffic stop. Corporal Garren testified that the computer check took less than 30 seconds.

Having made the decision to stop Defendant, Corporal Garren followed Defendant and activated the lights on his cruiser. Defendant responded by turning into a parking lot of an industrial park. After Defendant stopped, Corporal Garren approached his vehicle and asked for his driver's license, insurance, and registration. Defendant told him he did not have a license, but he gave him an identification and insurance card. The identification card matched the information of the revoked driver's license. Corporal Garren returned to his cruiser and performed a further

-2-

computer check. Corporal Garren testified that it showed Defendant's driver's license was revoked for DUI. He also called the insurance company and was told the policy was cancelled.

At that point, Corporal Garren said he made the decision to arrest Defendant. As Defendant had a dog in his vehicle, Corporal Garren returned to Defendant's vehicle and asked if he knew someone who could come get the dog because he was placing him under arrest for having a revoked license for DUI. Defendant responded yes and used a cellphone in his possession to call someone to pick up the dog. In the meantime, Corporal Garren asked Defendant to step out of the vehicle to conduct a pat-down search. In doing so, he asked Defendant if he had any drugs or anything that could pose a danger. Defendant ultimately responded that he might have methamphetamine. Corporal Garren then found methamphetamine in a box in the inner liner of Defendant's jacket. Thereafter, Defendant was placed in handcuffs and seated in the back of the cruiser. In searching the vehicle, Corporal Garren found digital scales, plastic sandwich baggies, an assortment of pills, and three small bags of heroin. Corporal Garren also seized the cellphone Defendant had, put it in an evidence bag, and placed it, along with other seized items, on the hood of his cruiser.

While continuing to search the vehicle, a tow truck driver arrived on scene to impound Defendant's vehicle. On the body camera video submitted into evidence, Corporal Garren can be heard telling the driver that he knew where Defendant lived and that he had seen the vehicle there in the past. Another trooper then arrived at the scene, and the two officers continued to search the vehicle. Corporal Garren can be heard telling the other officer that

Defendant "just moved in. I've been watching his car," and he described where Defendant lived. *Body Camera Footage Tr.* at 16, ECF No. 105-1.

While searching, the officers found a second cellphone that was locked by a code. A little later, Corporal Garren walked over to Defendant, who remained in the back of the cruiser, and asked him about who was coming to get the dog and the two phones. Defendant told him that the second phone belonged to the individual who owned the dog. Corporal Garren then went to the front of the cruiser and removed from the evidence bag the cellphone Defendant previously had used. The cellphone was unlocked. Corporal Garren briefly scrolled its contents, walked back to Defendant, and asked him if it was okay for him (Corporal Garren) to use the phone to call back the individual about picking up the dog. Defendant agreed so Corporal Garren hit the call button. No one answered. Corporal Garren then mentioned to the other officer that he was going to get a search warrant for the phone.

After doing a few other things, Corporal Garren again used the phone again to call the phone number. After a second attempt, someone answered, who said he was on his way to get the dog. The other officer then stayed at the scene to wait for the person getting the dog, and Corporal Garren left with Defendant to take him to the State Police detachment. Corporal Garren took the cellphones with him. On the way to the detachment for processing, Corporal Garren and Defendant had a conversation about a variety of things, including questions about Defendant's drug use, whether the bags of white powder found in Defendant's vehicle were heroin or fentanyl, and whether Defendant sells drugs.

Once inside the detachment, Corporal Garren asked Defendant if he would tell him where he got the drugs. Defendant responded by saying "I'd rather not." *Tr. of Body Camera Footage*, at 38, ECF No. 105-1. Thereafter, Corporal Garren returned to the cruiser and retrieved the cellphones. One of the cellphones was powered on, with a message displayed. Corporal Garren went about displaying the cellphones and other evidence for photographic purposes, and the body camera footage then ends.

During his testimony, Corporal Garren stated that, after the body camera footage ended, he took Defendant's cellphone with him into the processing room and asked Defendant if he could look through it. According to Corporal Garren, Defendant agreed. As he was looking through text messages, Corporal Garren said he saw messages involving pills. Corporal Garren stated that, although Defendant did not withdraw his consent for him to search the phone, he stopped looking at it and told Defendant he would be getting a search warrant. Thereafter, on February 8, he obtained a warrant for the phone, which was subsequently examined at a Digital Forensics Lab.

On cross-examination, defense counsel questioned Corporal Garren about the Report of Criminal Investigation he completed following Defendant's arrest.[2] In the Report, Corporal Garren mentioned that, when Defendant's vehicle passed him, he observed the driver was an "an older white male" and he noticed a taped over broken or cracked taillight. *Report of Crim. Invest.*, at 10, ECF No. 86-10. He also wrote that, after running the vehicle's license plate,

---

[2]Admitted as Defendant's Exhibit 10, ECF No. 86-10.

he learned of the revoked driver's license and he initiated a traffic stop. During his testimony, Corporal Garren admitted that he recognized the vehicle prior to the stop, but he did not know who the driver was until he stopped him. Later in the Report, Corporal Garren also wrote that Defendant permitted him to look through his cellphone while in the processing room and he "observed numerous text messages related to the sale of drugs." *Id.*

In both the Criminal Complaint and the "Facts for Belief" in support of the search warrant for the cellphone, Corporal Garren also mentioned the problem with the taillight.[3]  He also wrote in both documents that he was able to cross-reference the license plate with Defendant's driver license and learned it was revoked. *Id.* Likewise, he mentioned before the Grand Jury that he knew about the revoked driver's license. *See Tr. of Justin Garren before the Grand Jury*, at (Apr. 5, 2022), ECF No. 86-12. Corporal Garren testified before this Court that, although he did not know at first the reason why the license was revoked, he knew the license was revoked before he activated the lights on his cruiser and that it was the main reason he pulled Defendant over. However, Corporal Garren testified at Defendant's detention hearing that he stopped Defendant for the broken taillight.[4]

Defense counsel also questioned Corporal Garren about the events that occurred after Defendant was taken to the detachment for processing. Corporal Garren testified that his body

---

[3]These documents were entered into evidence as Exhibits 11 and 12 respectively. ECF No. 86-11 and 19.

[4]*Tr. of Justin Garren at Arraignment/Detention Hrg.*, at 7-8 (May 24, 2022), ECF No. 86-17. Defendant pointed out at the Pretrial Motions Hearing that the lightbulb actually functioned, but the case was cracked and had clear tape on it.

camera was off because there was a security camera in the processing room. Corporal Garren further testified that he read Defendant his *Miranda* rights for the first time inside the processing room after the body camera was turned off. Corporal Garren indicated that he did not use a written *Miranda* form for Defendant to sign because the room had a recording device. Additionally, Corporal Garren testified that Defendant consented to his cellphone being searched while they were in the processing room.

At the conclusion of the hearing, the Court directed, *inter alia*, the Government to determine whether or not a recording of what occurred in the processing room existed and, if so, to provide a copy to the Court and Defendant as quickly as possible. The Court also required the Government to provide the Court and Defendant a record or information reflecting what Corporal Garren saw on his computer screen when he ran Defendant's license plate and driver's license. The Court further ordered the parties to file supplemental briefing.

In its Response to the Court's directives, the Government submitted a video from December 3, 2022, demonstrating the steps Corporal Garren used to do the computer check in his cruiser. It also submitted printouts depicting what an officer sees on the screen when a search is performed. *See Ex*. 2-4, ECF No. 89. The Government states, however, that the video recording from the processing room, where Corporal Garren said he gave Defendant his *Miranda* rights and got consent to look at his cellphone, is no longer available. Nevertheless, the Government argues that both of Defendant's arguments regarding the constitutionality of the stop and the search of the cellphone should be denied. For the reasons stated below, the Court agrees with the Government

as to the traffic stop. However, it continues to take under advisement Defendant's Motion to Suppress the contents of the cellphone.

## II.
## CONSTITUTIONALITY
## OF THE TRAFFIC STOP

In his Motion to Suppress, Defendant argues, in part, there was insufficient reasonable suspicion to conduct the traffic stop. In order to comply with the Fourth Amendment's prohibition of unreasonable searches and seizures, it is well established that a police officer may initiate a brief investigative traffic stop when the officer "has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (quoting *United States v. Cortez*, 449 U.S. 411, 417-418 (1981); also citing *Terry v. Ohio,* 392 U.S. 1, 21–22 (1968)). In *Glover*, the defendant was stopped after a police officer ran a license plate number and found the registration matched the observed vehicle and the registered owner had a revoked driver's license. *Id*. at 1188. The defendant challenged the reasonableness of the stop, arguing the search was unreasonable under the Fourth Amendment because the officer had to infer that the driver of the vehicle was the registered owner. In upholding the reasonableness of the stop, the Supreme Court found there was no exculpatory information indicating the driver was not the registered owner and the officer "used common sense to form a reasonable suspicion that a specific individual was potentially engaged in specific criminal activity—driving with a revoked license." *Id*. at 1190-91. Thus, the Court found there was no Fourth Amendment violation.

In this case, Corporal Garren testified he ran a computer check of the license plate number after Defendant passed him. Upon learning the vehicle was registered to a George Thayer,

he clicked the name and found only two George Thayers lived in the area, with only one of those having a birthdate matching the approximate age of the person he observed driving the vehicle. The West Virginia State Police Main Radio Log Table and body camera footage are consistent with this testimony. The Radio Log shows Corporal Garren checked the license plate at 15:33:50 and a driver's license check was performed at 15:34:06. *See Main Radio Log Table*, at 1-2, ECF No. 88-1. As the body camera footage began at 15:33:29 and is designed to back up one minute of video recording prior to the activation of the lights on the police cruiser, it indicates Corporal Garren activated his lights at 15:34:29, which was after he learned Defendant's driver's license was revoked.[5] At 15:39:14, which was after the stop, a second driver's license inquiry is reflected on the Radio Log. *Id*. at 3.[6] Given this evidence, the Court finds, as in *Gavin*, that Corporal Garren drew a reasonable, common-sense suspicion that Defendant was engaged in criminal activity by driving on a revoked license before he was pulled over.

Nonetheless, Defendant attempts to assail the basis for the stop by pointing to the evidence showing Corporal Garren had been watching Defendant and knew his identity before he decided to stop him. In the body camera footage, Corporal Garren is heard telling both the tow truck driver and the other officer at the scene he was familiar with the vehicle, he knew where Defendant lived, and he had been watching the residence. Additionally, Corporal Garren testified at Defendant's detention hearing that he stopped him because of his taillight and made no mention

---

[5]Although slightly different due to the passage of time from the date of Defendant's arrest, the video and printouts the Government submitted following the hearing further substantiate Corporal Garren's testimony about the results he received and how quickly he received them. *See Ex*. 2-4, ECF No. 89.

[6]This inquiry appears consistent with the computer check Corporal Garren ran after the stop showing Defendant's revocation was for DUI.

of stopping him for a revoked license. Defendant maintains that, as the light functioned and only the cover was broken, it was not a violation of West Virginia law and it could not be used to validate the stop. Defendant argues this evidence demonstrates that Corporal Garren just played a hunch, without any legal justification, when he stopped Defendant.

Although the Court agrees with Defendant that Corporal Garren's comments indicate he was aware of Defendant's vehicle prior to the stop, such awareness does not undermine the reasonableness of stop itself. Other than his testimony at the Detention Hearing, Corporal Garren repeatedly stated in the Report of the Criminal Investigation, the Criminal Complaint, the Facts for Belief, and in his testimony before the Grand Jury that the computer check revealed Defendant had a revoked license. Given the consistency of this evidence with the body camera footage and his testimony before this Court that he learned of the revoked license before he initiated the stop, the Court finds any inconsistency in his testimony at the Detention Hearing is of no consequence. The overwhelming evidence is that Corporal Garren stopped Defendant after the computer alerted him to the fact Defendant's license was revoked. As the revoked license was sufficient to justify the stop, whether or not the condition of the taillight cover also was sufficient to justify the stop is immaterial to the Court's analysis. Corporal Garren only needed one valid reason to conduct the stop, which he had based upon the status of the revoked license. Therefore, the Court **DENIES** Defendant's Motion to Suppress based upon his argument that the stop violated his Fourth Amendment Rights.

As to Defendant's motion with respect to his cellphone, the Court continues to take that matter under advisement. Therefore, it holds that portion of Defendant's motion in abeyance.

-10-

**III.**
**CONCLUSION**

Accordingly, for the foregoing reasons, the Court **DENIES** Defendant's Motion to Suppress as to the constitutionality of the traffic stop and **HOLDS IN ABYEANCE** Defendant's request to suppress the contents of his cellphone.


The Court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        January 13, 2023

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE